**Arthur SILVA et al., Plaintiffs-Appellants,**

v.

**George ROMNEY et al., Defendants-Appellees,**
**and**
**Harry Wolk, Intervenor-Appellee.**

No. 72–1352.

United States Court of Appeals,
First Circuit.

Heard Dec. 7, 1972.

Decided Feb. 2, 1973.

John Leubsdorf, Boston, Mass., with whom Foley, Hoag & Eliot, Boston, Mass., and Anne M. Vohl, Lexington, Mass., were on brief, for plaintiffs-appellants.

J. Owen Todd, Boston, Mass., with whom Robert W. Mahoney and Hale & Dorr, Boston, Mass., were on brief, for Harry Wolk, intervenor-appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

■ This case involves a housing project undertaken by a private developer with a commitment by the Department of Housing and Urban Development (HUD) to provide a mortgage guarantee and an interest grant. The district court, finding that the project was "likely to be found to be a major federal action" significantly affecting the environment, enjoined HUD from giving any assistance until an environmental impact statement is prepared. The court, however, did not similarly enjoin the private developer from any interim action affecting the environment, here the cutting of trees. This appeal concerns the court's power to enjoin the developer under such circumstances. We hold that this power exists and that the case should be remanded for a hearing on the merits of the request of those living in the neighborhood of the project (appellants) for a preliminary injunction. We are also impelled to go beyond the strict necessities of this case, in view of the increasing frequency of this kind of litigation, and urge the adoption by HUD of suitable "status quo" regulations.

The developer's "Forest Glen Project" contemplates the construction of 138 low and moderate income housing units on an 11.38 acre woodland tract in Stoughton, Massachusetts. HUD had been requested to provide and had approved a mortgage guarantee in the amount of $4,000,000 and an interest grant of $156,000, but the final closing had not yet taken place. Appellants, claiming that their neighboring properties will be adversely affected by the project as presently contemplated, originally brought suit to enjoin HUD from aiding the project until an environmental impact statement had been filed under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332 (2)(C) and appropriate regulations, rather than the less researched "Special Environmental Clearance Worksheet" which had been filed. The developer was granted leave to intervene. After a hearing on a request for a preliminary injunction, the district court enjoined HUD, concluding that "the Forest Glen project appears likely to be found a major federal action . . . [that there is] a reasonable likelihood that [appellants] will prevail on the merits, that the grant of preliminary relief will not irreparably harm the defendants, and that denial of relief would irreparably harm [appellants]." Silva v. Romney, 342 F.Supp. 783, 785 (D.Mass.1972). Subsequently HUD withdrew its appeal from that decision and commenced preparation of a full environmental impact statement.

■ While the HUD study was continuing, appellants learned that the developer had cut down trees on about three acres of the tract and on September 8, 1972 filed a "Motion for Relief Preserving Status Quo" to temporarily enjoin the developer's actions pending completion of the HUD impact statement. On September 12 appellants filed a "Motion for Temporary Restraining Order" which was denied, after a non-evidentiary hearing, on September 28. Thereupon appellants filed on September 29 a "Motion for Hearing on Motion for Relief Preserving the Status Quo" which included a request for a preliminary injunction. The motion was denied on Oc-

tober 16 and this appeal followed.[1] At argument the developer undertook voluntarily to refrain from further cutting pending our decision.

The district court did not, in denying injunctive relief, set forth findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P. We think it clear from the major thrust of the argument below that the court deemed itself without authority to prevent the developer from doing "as he wishes" with his own property.[2] In particular, the developer now, as then, relies heavily on our opinion in City of Boston v. Volpe, 464 F.2d 254, 257 (1st Cir. 1972), where we stated that "agencies may be subject to duties concerning a proposed federal action at a time when an applicant may not yet be enjoined from acting on his own." Thus the developer argues that even if we were to remand to the district court for an evidentiary hearing on appellants' motion for a preliminary injunction, no such relief could be issued under any possible factual situation because the district court lacks power to enjoin a private party from using his land as he pleases simply because an application for federal aid has been filed.

In *City of Boston*, the administrative process had reached no farther than an intra-agency "preliminary and tentative" allocation of funds. Here, HUD had represented that "the provision of HUD aid for this project has been approved by HUD". The extent of commitment has been made even more clear by a memorandum filed with this court which reveals that in November, 1971, the Federal Housing Authority issued a 180-day commitment concerning the Forest Glen Project, creating a contract between the Authority and the developer.[3] These arrangements therefore have reached "the point at which the federal government becomes a partner with" the potential grantee. *City of Boston, supra* at 256, n. 2.

We must therefore reject the developer's argument that he may not properly be enjoined, since it is "beyond

1. We have stated with precision the procedural aspects of the case in the district court because the developer has contended that the case is not properly before us on appeal. Close examination of the papers, somewhat confusing because of their novel terminology, indicates that we have jurisdiction under 28 U.S.C. § 1292(a)(1), since the district court did, in accordance with the developer's suggestion that "the subject motion . . . be denied without hearing", refuse to grant a preliminary injunction.

2. While we could perhaps remand for the purpose of setting forth findings, neither appellants nor the intervenor have been misled as to the basic issue of power to enjoin a private owner, *see* Urbain v. Knapp Bros. Mfg. Co., 217 F.2d 810, 816 (6th Cir.), cert. denied, 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed. 1260 (1955), and further delay in resolving the issue would be a disservice to all parties. It is true that two other possible bases for decision were briefly advanced: the lack of irreparable harm to plaintiffs if an injunction were refused and a request that plaintiffs post a $350,-000 bond. As to the former, the court's reasoning in granting the injunction against HUD specifically included a conclusion that plaintiffs' harm would be ir-reparable. As to the bond, no prior estimate of damages had been forthcoming and, wholly apart from the legal issue whether substantial bond in environmental cases is required, *see* Natural Resources Defense Counsel v. Grant, 3 E.R.C. 1659 (4th Cir. 1972), it is highly unlikely that the court, *sub silentio* accepted the developer's estimate and relied on the absence of any such bond, since it made no effort to require one.

3. The government originally declined to take any part in this appeal since appellants now seek relief only against the developer. Upon order of this court that the government file a memorandum or brief to include a discussion of the nature of the obligations between the developer and the government, a memorandum from the Division of Land and Natural Resources, Justice Department, was filed with us one day prior to argument. While helpful, more complete government views on the sensitive issue here involved would have been of valued assistance. In environmental matters particularly, we would hope that the government would realize that courts need the expertise and views of responsible agencies whose programs will be affected, one way or another, by litigation.

challenge" that one in partnership with the federal government can be prohibited from acting in a certain manner. Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). Such action has been taken in the NEPA context in Boston Waterfront Residents Ass'n v. Romney, 343 F.Supp. 89 (D. Mass.1972), where the Boston Redevelopment Authority, a recipient of HUD funds, was enjoined from proceeding with demolition work until HUD, its benefactor, had complied with NEPA. In Gibson v. Ruckelshaus, 3 E.R.C. 1028 (E.D.Tex.1971), the city of Lufkin received a conditional grant from the federal Environmental Protection Agency (EPA) for sewer construction, dependent upon obtaining land titles and easements, but was enjoined from prosecuting a state condemnation suit until a federal suit alleging EPA's noncompliance with NEPA could be heard.[4] *See also* Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013, 1027 (5th Cir. 1971);[5] West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232, 236 (4th Cir. 1971). Indeed, the imposition of environmental restraint upon one so linked with a federal grantor would seem to be consistent with the Congressional declaration that "each person has a responsibility to contribute to the preservation and enhancement of the environment", 42 U.S.C. § 4331(c).

Not cited to us, but perhaps opposed to this principle is Ely v. Velde, 451 F. 2d 1130 (4th Cir. 1971), in which the Law Enforcement Assistance Administration had approved the grant of federal funds to Virginia to build a penal institution, and no statement, pursuant to 42 U.S.C. § 4332(2)(C), having been filed, the federal agency was enjoined from making the grant, though the court refused to prevent the state from proceeding with construction plans. While it appears from the reported facts that the state did little, if any, actual work on the land involved so that the status quo was not disturbed environmentally, to the extent that the court determined that NEPA imposes no duties upon non-federal entities which have entered into partnership with the federal government, we respectfully decline to follow it. The nexus here between HUD and the developer is so extensive that the district court had power to enjoin the developer's actions, and the case will be remanded for a determination of whether an injunction should issue.

While this case, as we have noted, is not controlled by *City of Boston*, we confess to a sense of growing uneasiness in seeing decisions determining the obligations of federal and non-federal parties under NEPA turn on any one interim step in the development of the partnership between the parties. Such an approach unrealistically stresses adventitious factors which bear little relationship to either the broad concerns of NEPA or the interests of the potential grantee, private or public. Hence, in the present case, the mere fact that a binding contract has been entered into between HUD and the developer is but one manifestation of and quite irrelevant to an ongoing planning process by all parties to the project which must

---

4. *Gibson* was reversed in a short memorandum, *sub nom.* City of Lufkin v. Gibson, 447 F.2d 492 (5th Cir. 1971), presumably because counsel for plaintiffs-appellees had refused to cooperate with the court.

5. In *City of Boston* we noted the different planning and funding schemes in highway construction programs like that in *Named Individual Members of San Antonio Conservation Society* and the airport aid scheme and found the differences relevant

in determining whether and when the aid recipient could be enjoined. While we are less sure now of the importance of those differences, we subscribe fully to the rationale of the highway cases to the effect that once the partnership stage has been reached between the federal and non-federal entities, all parties in a project are subject to injunctive process. *See City of Boston, supra,* 464 F.2d at 258, n. 6.

provide for the reasonable expectations of the parties.

We are convinced that there exists a void which can be sensibly filled only by "status quo" regulations which guide the government, aid applicants and the general public where "proposed [major federal] actions", 42 U.S.C. § 4332(2)(C) —i. e., potential major federal actions— are involved. Such regulations which address the problem of what action may be taken on a project while an environmental impact statement is being prepared and discussed can only contribute to better decision-making.

The government, for its part, has an enormous investment in conducting detailed impact studies in accordance with 42 U.S.C. § 4332(2)(C), such that it must have some reassurance that its work will not be in vain, but will be put the best possible use in avoiding environmental damage in a contemplated federally-aided project. It could, working with the knowledge that a status quo regulation applies, continue to expend large resources on environmental studies without fear that the ecological premises of those studies might be so changed as to effect the validity of the conclusions reached.[6]

If a pre-partnership regulatory scheme is in the government's interest, it is equally in the interest of the developer. First, developers would be encouraged to conduct their own detailed environmental studies before applying for aid so that their applications could be processed more easily,[7] and they would presumably press the agencies for early decisions which could help prevent unnecessary foot-dragging where a project has received thorough federal review. Second, they ought to know what preconditions exist for government approval of the aid application, what grounds exist for subsequent withdrawal or recission of any agreement reached, and what assurances there are against arbitrary government action. These necessary precautions are absent in the government's assertion here that "the FHA Commissioner could, at his discretion, elect to rescind the contract" if the impact statement were unfavorable.

Furthermore, the absence of guidelines under which the Commissioner should operate makes his decision less meaningful and court review more difficult where an appeal is taken either by an applicant who has been denied aid or whose aid has been rescinded or by others, like appellants here, who wish to challenge approval of the grant. Moreover, any court-generated rule could give but limited guidance to the developer, the government or other interested parties. There are bound to be circumstances where developers should be allowed to do certain things on a project, pending completion and review of an impact statement, as when the preparatory work is environmentally neutral or the adverse impact is virtually non-existent.

Given the important goals of protecting the environment and providing adequate housing for many lower and middle class Americans, status quo regulations in a situation like the one before us could prevent the irony which might occur where a partially built project which went ahead with little concern for the environment could not be completed because federal funds were denied to avoid subsidizing environmental harm, the twin results being no housing and an impaired environment. Without regulations, the prospect of such a fiasco could not fail to tempt the agency to sacrifice its environmental concern to continuing with its housing function.

---

6. The fact that the government might recover such costs from the developer under 31 U.S.C. § 483a does not reach the concern of wasted time and effort.

7. We recognize that such studies are not substitutes for the Congressionally-mandated agency studies. *See* Greene County Planning Board v. F.P.C., 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

Apart from the practical advantages of regulations in the pre-commitment stage, there would seem to be strong legal underpinnings, if not an actual mandate. Congress has *"direct[ed]"* that, *to the fullest extent possible:* (1) the policies, regulations, and public laws of the United States *shall* be interpreted and administered in accordance with the policies set forth in [NEPA]." 42 U.S.C. § 4332(1) [emphasis added]. We cannot think of any stronger language which could have been used to underscore the importance of protecting the environment. These duties are not discretionary, but are specifically mandated by Congress, and are to be reflected in the procedural process by which agencies render decisions. Moreover, the President has required that agencies review their "statutory authority, administrative regulations, policies, and procedures, including those relating to loans, grants, contracts, leases, licenses, or permits, in order to identify any deficiencies . . . which prohibit or limit full compliance with the purposes and provisions of [NEPA]." Executive Order 11514, 35 Fed.Reg. 4247 (March 7, 1970). "Corrective measures" must then be taken to bring its "authority and policy into conformance with the intent, purposes, and procedures" of NEPA. *Id.*

Given these directives and HUD's own authority to "make such rules and regulations as may be necessary to carry out [the Secretary's] functions, powers and duties", 12 U.S.C. § 1701c, we see no insuperable barrier to a regulatory scheme which would require applicants for federal aid to a potential "major federal action" to maintain the status quo of the project pending federal environmental review in accordance with NEPA. Such a requirement, though obviously hindering the freedom of the private developer, would recognize that the developer has voluntarily submitted to some degree of federal regulation as an aid applicant and that what is affected is not purely private in nature but a project which is intended to and which can go ahead on the same scale generally only with public assistance.[8]

The coexistence of this regulatory gap and the strength of the Congressional and Presidential directives might well justify a court in requiring an agency to formulate status quo regulations. *See* Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 598 (D.C.Cir.1971); N. L. R. B. v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir. 1966); Calvert Cliffs Coordinating Committee v. A. E. C., 146 U.S.App.D.C. 33, 449 F.2d 1109 (D.C.Cir. 1971). We do not need to take this step at present, but have discussed the wisdom of regulations at length with the hope that courts can play a more structured role in environmental cases.

In conclusion, since we have found that the district court may properly enjoin the developer from continuing work on the project pending the outcome of the environmental impact study, the case must be remanded to determine if a preliminary injunction will issue. The district court must be given the opportunity to consider the injury to the developer if the injunction issues, Pauls v. Secretary of the Air Force, 457 F.2d 294 (1st Cir. 1972)—though this may not be controlling, *see* Buscaglia v. District Court of San Juan, 145 F.2d 274 (1st Cir. 1944), cert. denied, 323 U.S. 793, 65 S.Ct. 434, 89 L.Ed. 632 (1945). Having decided the case on these grounds we need not address appellants' persuasive alternative argument that the district court might have acted, independent of

---

8. We recognize that there is a delicate balance to be met between protecting private rights and the public interest which might allow a potential partner to alter the environmental status quo if it not merely asserts, but meets a heavy burden of proof, that the project will continue with or without federal aid. In this case, for example, in the absence of regulations and were it not for the fact that the partnership stage had been reached, we might have allowed the developer to attempt to carry this burden. Nevertheless, even this caveat gives us pause for it allows the wealthy to proceed, while restraining those with fewer resources.

NEPA, under the All Writs Act, 28 U.S.C. § 1651 or the Administrative Procedure Act, 5 U.S.C. § 705, pursuant to the rationale in F. T. C. v. Dean Foods Co., 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966) and Continental Illinois National Bank & Trust Co. v. Chicago R. I. & P. Ry., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935) to grant temporary relief.

Judgment vacated. Case remanded for' proceedings not inconsistent with this opinion.